**SHAFFY MOEEL**
California State Bar No. 238732
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: shaffy_moeel@fd.org

Attorneys for Eder Pedrotti-Juarez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE ROGER T. BENITEZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. EDER PEDROTTI-JUAREZ, Defendant. | ) | Case No. 08CR1627-BEN<br>DATE: September 11, 2008<br>TIME: 2:00 p.m.<br>**NOTICE OF MOTION AND MOTION TO:**<br>**1) DISMISS THE INDICTMENT DUE TO AN INVALID DEPORT** |

TO: KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
ANNE PERRY, ASSISTANT UNITED STATES ATTORNEY:

PLEASE TAKE NOTICE that, on September 11, 2008, at 2:00 p.m., or as soon thereafter as counsel may be heard, the defendant, Eder Pedrotti-Juarez ("Mr. Pedrotti"), by and through his counsel, Shaffy Moeel and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

**MOTIONS**

The defendant, Eder Pedrotti-Juarez, by and through his attorneys, Shaffy Moeel and Federal Defenders of San Diego, Inc., pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby moves this Court for an order:

1) To Dismiss the Indictment Due to an Invalid Deport.

//

//

//

These motions are based upon the instant motions and notice of motions, the attached statement of facts and memorandum of points and authorities, and all other materials that may come to this Court's attention at the time of the hearing on these motions.

Respectfully submitted,

DATED: September 11, 2008

/s/ *Shaffy Moeel*

**SHAFFY MOEEL**
Federal Defenders of San Diego, Inc.
Attorneys for Eder Pedrotti-Juarez

**SHAFFY MOEEL**
California State Bar No. 238732
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
E-Mail: shaffy_moeel@fd.org

Attorneys for Eder Pedrotti-Juarez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE ROGER T. BENITEZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 08CR1627-BEN |
| Plaintiff, | ) | DATE: September 11, 2008<br>TIME: 2:00 p.m. |
| v. | ) | |
| EDER PEDROTTI-JUAREZ, | ) | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MR. PUENTE-SILVA'S MOTION** |
| Defendant. | ) | |

**I.**

**INTRODUCTION**

Mr. Pedrotti's right to due process was violated by the Immigration Judge's failure to advise him of his eligibility to adjust status through his relationship with his parents and to file for voluntary departure. Because his parents were lawful permanent resident who would shortly become eligible for naturalization, the IJ erred by failing to advise Mr. Pedrotti that this form of relief was available to him. Additionally, because voluntary departure is only unavailable to individuals who suffer an aggravated felony after admission to the United States and Mr. Pedrotti was never admitted, the IJ erred by failing to advise him that voluntary departure was not available to Mr. Pedrotti. This legal error precludes the use of the flawed deportation order in this criminal prosecution.

//

//

## II.

## FACTS

On October 30, 2003, the Immigration and Naturalization Service issued Mr. Pedrotti a Notice to Appear ("NTA") alleging that he was removable from the United States for being an alien present in the United States without having been properly admitted. At the time, Mr. Pedrotti was just 19 years old. He had lived in the United States with his family since childhood, and still lived with his parents in San Diego. Mr. Pedrotti's father and mother were legal, permanent residents. Mr. Pedrotti was not represented by counsel during his deportation hearing.

On November 4, 2003, Mr. Pedrotti appeared before immigration judge ("IJ") Joseph Ragusa in San Diego. See Exhibit B, Transcript of Proceedings before the Immigration Judge. Mr. Pedrotti's immigration proceeding was a group hearing with a number of other pro-se individuals also before the IJ. Id.

The Immigration Judge read the group their rights, en masse. The IJ then proceeded to have an individual colloquy with Mr. Pedrotti. The IJ, likely recognizing Mr. Pedrotti's youth and his assimilation into American culture (Mr. Pedrotti's proceeding was in English), questioned Mr. Pedrotti about his background. Mr. Pedrotti confirmed that he entered the U.S. in 1989, when he was six years old. In response to the IJ's question, Mr. Pedrotti told the IJ that he had one U.S. citizen child who was one year old. Upon hearing this information, the IJ noted that Mr. Pedrotti could have been eligible for cancellation of removal as a non-permanent resident. Just a moment later, upon learning of Mr. Pedrotti's conviction pursuant to California Penal Code § 261.5(c), the IJ clarified that Mr. Pedrotti was not eligible for cancellation. The IJ, apparently dismayed at the prospect of sending this young Americanized man into exile away from his family and home, then immediately ended the colloquy with Mr. Pedrotti by saying, "It is the decision of the Court **unfortunately** that you be removed and deported from the United States to Mexico based on the charge contained in the notice to appear. That is the decision of the Court. The fact that you have this conviction sir, disqualifies you from relief." (emphasis added).

The IJ never considered nor advised Mr. Pedrotti for any other form of relief from deportation. The IJ never asked this young uncounseled man whether his parents had legal status to be in the United States, a significant factor for consideration of what forms of relief were available to him.

//

III.

**A. This Court Should Dismiss the Indictment Due to an Invalid Deportation.**

To successfully collaterally attack his deportation, Mr. Pedrotti must demonstrate that: 1) he exhausted all administrative remedies available to him to appeal his removal order; 2) the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and, 3) the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d); Ubaldo-Figueroa, 364 F.3d at 1048. "An underlying removal order is 'fundamentally unfair' if: '1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and 2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (citing Zarate-Martinez, 113 F.3d at 1197) (brackets omitted).

Importantly, although Mr. Pedrotti carries the initial burden on the issue of prejudice, once he makes a prima facie showing of prejudice, **the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome**. United States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003) (emphasis added).

As explained below, Mr. Pedrotti can demonstrate each of the elements necessary for this Court to sustain his collateral attack.

**B. Mr. Pedrotti is Exempt from the Exhaustion Requirement.**

A waiver of the right to appeal a removal order does not comport with due process when it is not "considered and intelligent." United States v. Gonzalez-Valerio, 342 F.3d 1051, 1054 (9th Cir. 2003). See also United States v. Pallares-Galan, 359 F.3d 1088, 1096 (9th Cir. 2004) (For a waiver to be valid, the government must establish by "clear and convincing evidence" that the waiver is "considered and intelligent."); United States v. Leon-Paz, 340 F.3d 1003, 1005 (9th Cir. 2003); United States v. Gonzalez-Mendoza, 985 F.2d 1014, 1017 (9th Cir. 1993) (finding a due process violation where immigration judge failed to inquire whether right to appeal was knowingly and voluntarily waived). In this case, because Mr. Pedrotti's waiver was based on inadequate and inaccurate advice regarding his rights, the government cannot establish by clear and convincing evidence that the appellate waiver was "considered and intelligent."

Due process requires the Immigration Judge assure that respondents in immigration court are "properly" advised of their eligibility for relief and that their decision to waive appeal is a "considered judgment." United States v. Mendoza-Lopez, 481 U.S. 828, 840 (1987). This means that when a respondent

appears pro se, the Immigration Judge must conduct a sufficient inquiry into the respondent's personal circumstances to develop the record and inform the alien of any potential relief. See 8 C.F.R. § 1240.11(a)(2) (2006) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing."). See also Agyeman v. INS, 296 F.3d 871, 884 (9th Cir. 2002) (stating that "the IJ has a duty to fully develop the record when an alien proceeds pro se"). The IJ therefore "must scrupulously and conscientiously probe into, enquire of, and explore for all relevant facts." United States v. Jacinto, 208 F.3d 725, 733 (9th Cir., 2002) (internal citations omitted); Colmenar v. I.N.S., 210 F.3d 967 (9th Cir. 2000) (Right to a "full and fair" violated when IJ failed to elicit relevant testimony from alien). See also Arce-Martinez-Valdez, 163 F.3d at 563 ("[W]here the record contains an inference that the petitioner is eligible for relief from deportation, the IJ must advise the alien of this possibility and give him the opportunity to develop the issue.").

The Immigration Judge Benchbook implements these regulatory and constitutional requirements by requiring the Immigration Judge to treat pro se respondents differently. See U.S. Dep't. of Justice, Exec. Office of Imm. Rev., Immigration Judge Benchbook at 110 (2001) ("Benchbook"). In particular, "[t]he Immigration Judge has a responsibility to advise the respondent of any relief to which he may be entitled to apply." Id. Moreover, "In all pro se matters, the [IJ] must be careful and solicitous of the respondent [so as to be] certain to have advised the respondent of all of his rights and obligations and the consequences of his obligations." When addressing pro se respondents, the IJ must ensure that "all of the respondent's questions will be answered." Id. at 110. As a result of this "solicitous" inquiry, the Benchbook notes, "in the case of an unrepresented respondent, the Immigration Judge will have to take a more active role in the development of the hearing." Id. at 110.

The Immigration Judge in this case failed to engage in the requisite inquiry of Mr. Pedrotti's circumstances, and consequently failed to advise him of relief for which he was plainly eligible. Contrary to law and the EOIR's own guidelines, the IJ declined to ask a mere 19 year old of the legal status of his parents, which would have clearly impacted his ability to apply for relief. Had the IJ asked about Mr. Pedrotti's parents, and inquired whether Mr. Pedrotti was an unmarried child of his parents, he would have immediately discerned that Mr. Pedrotti would have been eligible to adjust his status through his parents.

The IJ also failed to follow up with Mr. Pedrotti in any meaningful way. That the IJ considered and advised Mr. Pedrotti for one form of relief, which it ultimately turned out he did not qualify for, did not absolve the IJ of the responsibility required by law to advise him as to all forms of relief. Mr. Pedrotti was a 19-year-old who had obviously lived in the United States since he was 6 years old. The IJ's gross failure to inquire of Mr. Pedrotti's parents cannot be reconciled with his duty to do so. This failure is even more egregious because, while not a minor under criminal law, [1] Mr. Pedrotti was still a "child" for immigration purposes. Simple principles of fairness would have required the IJ in this case to more carefully scrutinize and analyze Mr. Pedrotti's case in order to keep him reunited with his family.

The failure of the IJ to advise Mr. Pedrotti of his eligibility for adjustment of status and a § 212(h) waiver excuses Mr. Pedrotti's waiver of his right to appeal. See United States v. Ortiz-Lopez, 385 F.3d 1202, 1204 n.2 (9th Cir. 2004) (A person eligible for relief from removal who is mis-advised by an IJ that he is not eligible for relief is "exempted from the exhaustion requirement" of § 1326(d)).

**C. Mr. Pedrotti Was Deprived of Judicial Review.**

To sustain a collateral attack on his removal order, Mr. Pedrotti also must demonstrate that the deportation proceedings improperly deprived him of judicial review. 8 U.S.C. § 1326(d)(2). As explained above, Mr. Pedrotti was deprived of the opportunity for judicial review because the IJ abdicated his responsibility to develop the record and erroneously concluded Mr. Pedrotti was not eligible for relief. Compare Mendoza-Lopez, 471 U.S. at 840 (failure to fully explain potential relief amounted to "complete deprivation of judicial review"); Ubaldo-Figueroa, 364 F.3d at 1049-50 (failure to inform an immigrant of possible eligibility for relief from removal is a denial of due process that invalidates the underlying deportation proceeding).

**D. Mr. Pedrotti's Deportation Proceeding Was Fundamentally Unfair and Prejudicial.**

Finally, Mr. Pedrotti must show that the proceedings were fundamentally unfair. "An underlying removal order is 'fundamentally unfair' if: (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding; and (2) he suffered prejudice as a result of the defects.'" Ubaldo-Figueroa, 364 F.3d at 1048 (quoting Zarate-Martinez, 133 F.3d at 1197). To establish prejudice, Mr. Pedrotti

[1] However, for immigration purposes, a "child" is defined as an unmarried person under twenty-one years of age. 8 U.S.C. § 1101(b)(1).

does not have to show that he would have been granted relief. Instead, he need only show that he had a "'plausible' ground for relief from deportation." Id. at 1050 (citing Arrieta, 224 F.3d at 1079). Furthermore, as noted previously, although Mr. Pedrotti carries the initial burden on the issue of prejudice, once he makes a prima facie showing of prejudice, the burden shifts to the government to demonstrate that the procedural violation could not have changed the proceedings' outcome. Gonzalez-Valerio, 342 F.3d at 1054.

**1. Mr. Pedrotti was Eligible to Adjust his Status to that of a Person Admitted for Permanent Residence.**

A non-immigrant may obtain relief from removal if he is granted "adjustment of status." Adjustment of status grants a non-immigrant the status of a person admitted for permanent residence. The adjustment of status statute states:

> "The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed."

8 U.S.C. § 1255(a); INA 245(a).

Though the language of the statute seems to limit its applicability to aliens who were inspected and admitted or paroled into the United States, in 2003 the statute had exceptions to this requirement. Specifically, the statute contained an exception that aliens who were "physically present" in the United States, and who "entered the United States without inspection" could apply for adjustment of status if "the alien remits with such application a sum equalling $1,000." 8 U.S.C. § 1255(i)(1); INA 245(i)(1)(effective December 21, 2000 to December 18, 2003). Thus, at the time of Mr. Pedrotti's removal proceedings in November of 2003, he could have applied for adjustment of status despite not having been admitted or paroled, if he paid $1,000 with his application. His family would have paid the $1,000 on his behalf.

Thus, if Mr. Pedrotti had been advised of his eligibility to adjust his status to that of a legal permanent resident at his 2003 removal proceedings, he most certainly would have applied as it would have meant reunification with his family and the only home he's ever known, he would have been eligible for adjustment of status as long as was admissible to the U.S. and eligible to immediately receive an immigrant visa. 8 U.S.C. §§ 1255(a) & 1255(i)(2); INA 245(a) & 245(i)(2).

**a. Mr. Pedrotti Was Eligible for a § 212(h) Waiver of Inadmissibility.**

Mr. Pedrotti was eligible to waive the California Penal Code § 261.5(c) conviction pursuant to INA 212(h), 8 U.S.C. § 1182(h)(1)(B). That section permits an application for adjustment of status to waive any crime involving moral turpitude upon a showing that his deportation would result in "extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien." *Id.*

Here, the IJ should have advised Mr. Pedrotti of the possibility of INA 212(h) relief. An Immigration Judge has a duty to advise the respondent of any "apparent" relief. See 8 C.F.R. § 1240.11(a)(2) (2006) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing.") Here, the IJ knew, at a minimum, that Mr. Pedrotti had one qualifying U.S. citizen relative, his one year old child. Had the IJ inquired further, as was required, the IJ would have discovered that in fact, Mr. Pedrotti had two parents who were legal permanent residents of the United States that would have quickly undertaken the naturalization process had they known or been informed that this would have meant that their son could avoid deportation and permanent exile. The IJ, having erroneously drawn the conclusion that the only form of relief available to Mr. Pedrotti was cancellation of removal for non-permanent residents, impermissibly never informed Mr. Pedrotti of any other forms of relief.

**b. Mr. Pedrotti Had An Immigrant Visa Immediately Available to Him.**

There are at least two ways that Mr. Pedrotti could have had an immigrant visa available to him. The first way is through a visa petition filed for Mr. Pedrotti on his behalf in 1990, at the time of the father's adjustment to a legal permanent resident. As the unmarried child of a legal permanent resident of the United States, at the time of his deportation hearing in 2003, Mr. Pedrotti was in visa preference category "2A." According to the U.S. Department of State's Archived Visa Bulletins, visas filed before March 15, 1996 on behalf of individuals in the 2A preference category were current by November of 2003. (See http://travel.state.gov/visa/frvi/bulletin/bulletin_2986.html). Thus, by the time of his deportation hearing, Mr. Pedrotti's visa was "current" and immediately available to him.

Even if Mr. Pedrotti's father had not applied for a visa petition on behalf of his son before 1996, Mr. Pedrotti could have still had a visa immediately available to him as the unmarried child of a United States citizen. Under 8 U.S.C. § 1151(b) certain aliens are not subject to "direct numerical limitations." INA

201(b). Specifically, "immediate relatives" of United States Citizens are exempted from numerical limitations on grants of permanent residency status. 8 U.S.C. § 1151(b)(2)(A)(i); INA 201(b)(2)(A)(i). Immediate relatives include the children of citizens. Id. To qualify as a child, the alien must be under 21 years old and unmarried. 8 U.S.C. § 1101(b)(1); INA 101(b)(1).

By the time of Mr. Pedrotti's deportation proceeding, his father had been a legal permanent resident of the U.S. for at least thirteen years. Mr. Pedrotti was 19 years old at the time of his deportation proceeding and unmarried. Mr. Pedrotti's father would have immediately naturalized. Having naturalized, his father would have immediately filed a visa petition on the young Mr. Pedrotti's behalf. United States v. Flores-Rodriguez, 236 Fed.Appx. 338 (9th Cir. 2007) (unpublished) (Remanding due to IJ's erroneous advice that respondent was ineligible for INA § 212(h) relief, even though relief would not be available until mother naturalized). Thus, had the IJ advised him of his eligibility for adjustment of status, Mr. Pedrotti could have had a visa immediately available to him in 2003.

**2. Mr. Pedrotti Was Eligible for Voluntary Departure**

Mr. Pedrotti satisfies § 1326(d)'s prejudice requirement because he was, in fact, eligible for pre-conclusion voluntary departure and had a plausible claim for relief. When IIRIRA took effect in 1997, it added § 1229c(a) to make voluntary departure much easier to obtain prior to the conclusion of the immigration hearing. In particular, section 1229c(a), unlike the pre-IIRIRA version of voluntary departure, former 8 U.S.C. § 1254(e), does not require the alien to "establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years." See 8 U.S.C. § 1254(e) (1995). Instead, IIRIRA's enactment of § 1229c(a) in 1996 created a new form of voluntary departure whose primary focus was minimizing administrative burdens associated with lawful physical expulsion of illegal aliens—by requiring waiver of the right to a complete hearing, eliminating the availability of judicial review and stays of the time period for departure—rather than rewarding the deserving with a means of avoiding formal deportation. Compare 8 U.S.C. § 1229c(a) (relief available "in lieu of being subject to proceedings under section 1229a of this title or prior to the completion of such proceedings") with § 1254 (1995) (repealed by Pub. L. 104-208 (Sept. 30, 1996)) (requiring a showing of good moral character but not waiver of proceedings).

Within the current immigration scheme, pre-conclusion voluntary departure "reveals Congress' intention to offer an alien a specific benefit—exemption from the ordinary bars on subsequent lawful admission—in return for a quick departure." Banda-Ortiz v. Gonzales, 445 F.3d 387, 390 (5th Cir. 2006). In effecting this contract-like exchange, the IJ may exercise discretion to grant voluntary departure even in the face of multiple immigration violations and fraud. E.g. Matter of Polanco-Davila, 2006 WL 901504 (BIA 2006) (unpublished).

Mr. Pedrotti therefore is precisely the person for whom pre-conclusion voluntary departure was designed. As the unmarried child of a lawful resident (and more immediately as his father or mother could have naturalized), Mr. Pedrotti is eligible for a visa permitting lawful entry, and therefore has an interest in avoiding the 10 year bar on lawful admission to the United States that would attend an order of deportation. Both parties therefore have legitimate interests in the speedy resolution of his immigration case before the Immigration Judge: Mr. Pedrotti obtains prompt release from immigration detention by exchanging the right to seek admission before the IJ for the right to seek admission through the consulate abroad without the normal time bars on readmission. The government conserves resources. And all parties and the IJ give meaning to the stated purpose of the Immigration and Naturalization Act: the preservation of family unity. See Watkins v. I.N.S. 63 F.3d 844, 851 (9th Cir. 1995) ("The favored status given to the family is firmly entrenched in immigration law: 'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united.'") (citing H.R.Rep. No. 1199, 85th Cong., 1st Sess. 7, reprinted in 1957 U.S.Code, Cong. & Admin.News 2016, 2020.").

Because this was Mr. Pedrotti's first and only deportation, because he was a young man who had lived in the United States for the last thirteen of his nineteen years, because his father was working to give him a lawful right to be in the country, and because an application for admission in immigration court would result in time-consuming litigation, it is at least plausible that government counsel would not have opposed his application for voluntary departure. Even if she had opposed, it is at least plausible under the circumstances that an immigration judge would have granted the relief. Compare Matter of Polanco-Davila, 2006 WL 901504 (BIA 2006) (unpublished) (IJ grant of voluntary departure affirmed, despite fraudulent

testimony before same IJ, because IJ properly weighed these negative factors with any equities, including the respondent's United States citizen wife and three children and pending petition for an immigrant visa.).

**1. Mr. Pedrotti's Alleged Conviction Does not Bar Voluntary Departure.**

Government counsel may argue that Mr. Pedrotti has been convicted of an "aggravated felony" because his alleged conviction for California Penal Code § 261.5(c). The government therefore may argue that Mr. Pedrotti was not eligible for voluntary departure and cannot establish he was prejudiced by the IJ's error. This anticipated argument must be rejected because the conviction would not bar him from receiving voluntary departure.

**a. Because Mr. Pedrotti was never "admitted," he would be eligible for voluntary departure even if he had been convicted of an aggravated felony.**

Mr. Pedrotti still would have been eligible for voluntary departure but for the IJ's mistake of law. It was undisputed at Mr. Pedrotti's deportation hearing that he had entered without inspection in 1989, and that he was never lawfully admitted to the United States or granted an adjustment of status to lawful permanent resident. As an unlawful entrant who had never been inspected and authorized to enter the United States, Mr. Pedrotti did not fall under § 1229c(a)'s provision disqualifying "[a]ny alien who is convicted of an aggravated felony at any time after admission." See 8 U.S.C. § 1227(a)(2)(A)(iii). Mr. Pedrotti was therefore eligible for voluntary departure. As noted above, by failing to advise Mr. Pedrotti of his eligibility, as required by the Pallares-Galan and Muro-Inclan line of cases, the IJ deprived him of any opportunity for judicial review.

This Court need look no further than the plain language of 8 U.S.C. § 1229c(a) to determine whether Congress intended an aggravated felon who was not convicted after being lawfully admitted to remain eligible for pre-conclusion voluntary departure—it did. Thus, although there exists a regulation advancing a different standard, 8 C.F.R. § 1240.26, the regulation is invalid and the agency interpretation is entitled to no Chevron deference.

Complicating this relatively straightforward undertaking, however, is 8 U.S.C. § 1229c(e), which purports to convey to the AG unfettered authority to further restrict eligibility for voluntary departure. Admittedly, this legislative delegation, if valid, provides a separate and independent ground that lends 8 C.F.R. § 1240.26 legitimacy. It is not valid, however, because § 1229c(e) is an unconstitutional delegation

of legislative power that violates separation of powers. Because the regulation is neither a permissible interpretation of the controlling statute nor an exercise of validly conveyed authority, the plain text of § 1229c(a) controls.

**i. The Plain Language of the Statute Controls**

This Court's interpretive task begins with the plain language of the statute. See Clark v. Capital Credit & Collection Services, Inc., 460 F.3d 1162, 1168 (9th Cir. 2006). No deference is due to "an agency's construction of the statute which it administers . . . [if] Congress has spoken directly to the precise question at issue [and] the intent of Congress is clear." Natural Resources Defense Council v. EPA, 915 F.2d 1314, 1320 (9th Cir. 1990) (quoting Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). When "Congress has spoken directly, in unambiguous terms," the Court need look no further—"that is the end of the matter." Id. Legislative prerogative requires the judicial inquiry to end with clearly stated plain language because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id.

When analyzing the text of § 1229c(a), this Court is "obliged to give effect, if possible, to every word Congress used." Clark, 460 F.3d at 1175. This Court has "consistently rejected interpretations that would render a statutory provision surplusage or a nullity." Id. (quoting In re Cervantes, 219 F.3d 955, 961 (9th Cir. 2000); alterations omitted). Reading the words "at any time after admission" out of the provision incorporated by § 1229c(a) would violate the rule that the statutory text be construed in "the broader part of the statute as a whole" in order to "avoid a construction which renders any language of the enactment superfluous." See id. at 1175, 1176 (citations omitted). "Only where a sensible result isn't reachable may [this Court] resort to the drastic step of ignoring statutory language." Id. (quoting Hearn v. W. Conference of Teamsters Pension Tr. Fund, 68 F.3d 301, 304 (9th Cir. 1995)(alterations omitted)).

The Ninth Circuit Court of Appeals has embraced Mr. Pedrotti's reading. See Ortiz-Lopez, 385 F.3d at 1205 n.3 ("Relief from removal under § 1229c(a) is categorically barred to . . . those 'deportable under section 1227(a)(2)(A)(iii),' which in turn means those convicted of an aggravated felony at any time after admission."). Perhaps more compelling, the Attorney General, in promulgating 8 C.F.R. § 1240.26, has also acknowledged that the § 1229c(a) plainly states what Mr. Pedrotti now argues. See Interim Rules Implementing IIRIRA, 62 Fed. Reg. 10312, 10326, Att'y Gen. Order No. 2017-97 (March 6, 1997) ("Sections

240B(a)(1) and 240B(b)(1)(C) of the statute bar aliens deportable under section 237(a)(2)(A)(iii) of the Act from voluntary departure. Because aliens entering without inspection are no longer considered deportable, however, the statutory bar might be read as allowing such aliens to obtain voluntary departure despite an aggravated felony conviction."). These comments make clear that the AG was aware of the conflict between the regulation he issued and the statutory text; the AG viewed the regulation as correcting a perceived "anomaly" created by the plain language, see id. ("The Department does not believe that Congress intended [the anomaly of more favorable treatment for aggravated felons who enter without inspection]."). The AG believed that issuing the regulation changed the state of the law. Id. ("the Department now exercises its discretion to bar such aliens from receiving this form of relief").

**ii. No Exception to the Plain Language Rule Applies**

The regulation cannot, however, trump the statutory text as a matter of interpretation unless "applying the plain language of the statute would lead to patently absurd results," United States v. Brown, 333 U.S. 18, 27 (1948), or "would render another section within the statute or within the act inoperative or contradictory," Yates v. Hendon, 541 U.S. 1, 17-18 (2004). Because neither exception applies, the "strong presumption that Congress has expressed its intent in the language it chose" is dispositive. See INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987); cf. Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc., 448 F.3d 1092, 1096 (9th Cir. 2006) (Bybee, J., dissenting from denial of rehearing en banc) ("I know of no 'illogicality' doctrine that permits us [or the AG] to change the words in a statute when we think there is a more logical way that Congress could have written it.").

Section 1229c(a)'s explicit limiting language, which makes pre-conclusion voluntary departure relief unavailable for someone who entered lawfully and then committed an aggravated felony but permits an unlawful entrant convicted of such a crime to apply for such relief makes sense. Different treatment of lawful and unlawful entrants reflects several perfectly rational policy choices: (1) lawful entrants who committed a serious crime after they were granted the privileges and benefits of lawful admission have engaged in an abuse of trust that unlawfully present felons have not;[2] (2) such persons "pose[] a potentially

---

[2]The "abuse of trust" rationale has been embraced by at least seven circuits to explain analogous ineligibility of criminal legal permanent residents (LPRs) versus criminal non-LPRs, who are eligible for INA § 212(h) relief. See Cordes v. Gonzales, 421 F.3d 889, 897 (9th Cir. 2005); Latu v. Ashcroft, 375 F.3d 1012, 1020-21 (10th Cir. 2004); De Leon Reynoso v. Ashcroft, 293 F.3d 633, 640 (3d Cir. 2002);

higher risk of recidivism," Taniguchi v. Schultz, 303 F.3d 950, 958 (9th Cir. 2002), and should not get the "second chance" to lawfully reenter that voluntary departure could offer, see Lara-Ruiz v. INS, 241 F.3d 934, 948 (7th Cir. 2001); (3) for unlawfully present criminal aliens, it is a higher priority to ensure their physical departure from the U.S. as expeditiously as possible, with minimal resistance and minimal expenditure of the administrative resources necessary to complete a full-fledged removal hearing; (4) the "benefit" of voluntary departure is virtually illusory for unlawful entrants because they are less likely to have the familial ties to seek lawful reentry, and therefore this form of relief achieves the same result as formal removal while saving the expense of subsidizing the alien's return travel;[3] and (5) Congress need only address a given problem "one step at a time."[4] Thus, Congress's chosen language is clear.

Neither is the plain language of § 1229c(a) a "typographical error," which might justify a regulatory correction of Congress's inadvertent mistake. To the contrary, the plain meaning, advocated by Mr. Pedrotti, is "fully grammatical and can be understood by people of ordinary intelligence." Amalgamated Transit Union, 448 F.3d at 1098 (dissent). Had it so desired, Congress could quite easily have substituted the language it used, "is not deportable under section 1227(a)(2)(A)(iii)," with the regulatory language, "has not been convicted of a crime described in section 101(a)(43) of the Act" or with even simpler language, such as "has not been convicted of an aggravated felony." It did not.[5] The plain language controls.

---

Jankowski-Burczyk v. INS, 291 F.3d 172, 176 (2d Cir. 2002); (Lukowski v. INS, 279 F.3d 644, 647-48 (8th Cir. 2002); Moore v. Ashcroft, 251 F.3d 919, 925-26 (11th Cir. 2001); Lara-Ruiz v. INS, 241 F.3d 934, 947-48 (7th Cir. 2001).

[3]Cf. De Leon Reynoso, 293 F.3d at 640 (eligibility for lawful return of unlawful entrants, because they likely lack "the ties to obtain a relative to petition the Attorney General for adjustment of status," is "more theoretical than real . . . and could have led Congress to omit non-LPRs in [§ 1229c's disqualification provision]").

[4]Jankowski, 291 F.3d at 179. Moreover, "Congress may well have considered that it had already suitably solved the problem presented by [unlawful entrant] aggravated felons" through § 1228's expedited removal provisions, which foreclose all relief so long as the AG elects to use this mechanism. Jankowski, 291 F.3d at 179.

[5]Congress's word choice was not due to confusion about the difference between deportability and inadmissibility, as the AG suggests, 62 Fed. Reg. at 10326. Congress was well aware of this difference, evident from its ability to distinguish between these concepts in the very same section of IIRIRA. See, e.g., Pub. L. 104-208, § 304 (defining removable as inadmissible under § 212 or deportable under § 237).

**iii. Section 1229c(e) Does Not Authorize the Narrowing Regulation**

The only remaining source of authority for 8 C.F.R.§ 1240.26 is 8 U.S.C. § 1229c(e), which provides: "The Attorney General may by regulation limit eligibility for voluntary departure under this section for any class or classes of aliens." 8 U.S.C. § 1229c(e) ("Additional conditions"). To the extent that this grant of authority supports the AG's promulgation of § 1240.26(b)(1)(i)(E) (enlarging § 1229c(a)'s class of ineligible aliens to include all individuals convicted at any time of an aggravated felony), it transgresses the constitutional principles of separation of powers and limit on legislative delegation.

Section 1229c(e) purports to convey to the AG the quintessentially legislative power to repeal duly-enacted legislation, in violation of the Constitution's dedication of such authority to Congress. See U.S. Const. Art. I , § 7 (laws may be made only upon bicameral passage and presentment to the President); Clinton v. New York, 524 U.S. 417, 438 (1998) (absence of a Constitutional provision "that authorizes the President [or the Attorney General] to enact, to amend, or to repeal statutes" is "equivalent to an express prohibition"). Section 1229c(e)'s delegation of power suffers from the same problems as the Line Item Veto Act (LIVA), struck down by the Supreme Court in Clinton. The President's power to unilaterally veto provisions of duly-passed budgetary legislation under LIVA amounted to the power of unilateral repeal—a power the President may not constitutionally posses. Id. at 445-46 ("The fact that Congress intended such a result if of no moment."). Like LIVA, § 1229c(e) unconstitutionally authorizes an executive branch officer, the AG, to repeal or partially repeal § 1229c(a)'s provision creating the possibility of pre-conclusion voluntary departure. Under its terms, the AG could "limit eligibility for voluntary departure" by making it entirely unavailable—effectively repealing that part of the statute. See id. at 441 ("cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled"). It makes no difference that Section 1240.26 exercises § 1229c(e)'s power to effect a partial (and not a full) repeal of § 1229c(a)—by eliminating voluntary departure for the group of otherwise eligible unlawful entrants to which Mr. Pedrotti belongs, but not for everyone. See Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 473 (2001) (an agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power"). Neither does the AG's discretion to deny voluntary departure on an individual basis ameliorate the problem because the regulation results in a crucial functional difference: it abrogates the right to individual consideration for relief. See United States ex rel. Accardi v. Shaughnessy,

347 U.S. 260, 266-68 (1954) (the BIA's "*failure to exercise* its own discretion, contrary to existing valid regulations," due to the AG's blacklisting of petitioner, violated petitioner's due process right to the "opportunity to try . . . to convince the Board" to exercise discretion in his favor); accord Clinton, 524 U.S. at 446-47, 466-67 (Scalia, J., dissenting) (advancing such an argument, rejected by the Court).

Section 1229c(e)'s standardless grant of authority to restrict voluntary departure eligibility also runs afoul of the nondelegation principle because it fails to "lay down . . . an intelligible principle to which the person or body authorized to act is directed to conform." Whitman, 531 U.S. at 472 (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)). Indeed, the statute provides "literally no guidance of the exercise of discretion." Id. at 474. Under its terms, the AG may "limit eligibility . . . for *any* class or classes of aliens." 8 U.S.C. § 1229c(e) (emphasis added). This unfettered grant of authority stands in stark contrast to legitimate delegations, where Congress has typically identified a specific purpose,[6] "declared a general rule and imposed the duty of ascertaining what particular cases came within the rule," see Panama Refining Co. v. Ryan, 293 U.S. 388, 426 (1935), or charged the agency with a micro-level administrative task, see Whitman, 531 U.S. at 475 (agency to define which types of grain elevators are "country elevators"). Because "Congress has set up [no] standard for the [AG's] action," has not "required any finding by the [AG] in the exercise of the authority" under the provision, and has made no clear declaration of policy, § 1229c(e)'s broad grant of authority is at the least constitutionally infirm, if not entirely unconstitutional. See Panama Refining Co., 293 U.S. at 415.

Particularly telling is the fact that the AG has employed § 1229c(e)'s power to contravene the express language used by Congress, see 62 Fed. Reg. at 10326, a decision made on the same policy level as the legislative act—which smacks of an "undemocratic" legislative attempt to "escap[e] the sort of accountability that is crucial to the intelligible functioning of a democratic republic."[7] John Hart Ely,

---

[6]See United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725, 416 F.3d 977, 979-80 (9th Cir. 2005) (agency to define what sort of shotgun "is generally recognized as particularly suitable for sporting purposes"); see also South Dakota v. United States Department of the Interior, 423 F.3d 790, 798-99 (8th Cir. 2006) (statute authorizing the Secretary of the Interior to acquire property "for the purpose of providing land for Indians").

[7]This risk appears doubly likely in light of § 1229c(e)'s jurisdiction-stripping provision: "No court may review any regulation issued under this subsection." This sentence does not bear upon the appeal at hand, where appellate jurisdiction is undisputed in this direct federal criminal appeal. Moreover, 8 U.S.C.

Democracy and Distrust 132 (1980) (legislators may delegate power to avoid "politically controversial decisions—to leave them instead to others, most often others who are not elected or effectively controlled by those who are"); see also Cass R. Sunstein, Nondelegation Canons, 77 U. Chi. L.Rev. 315, 317-18 (2000) ("certain highly sensitive decisions should be made by Congress, and not by the executive pursuant to open-ended legislative instructions").

In light of its likely, if not actual, unconstitutionality, constitutional avoidance at the very least requires the scope of § 1229c(e) to be limited to authorize only legitimate administrative purposes. One possible construction would limit "any class or classes of aliens" to classes defined by some nexus to reducing the administrative burden, which is in line with § 1229c(a)'s goal of permitting physical removal without the expending the time and resources necessary to conduct a full hearing. Other provisions of 8 C.F.R. § 1240.26 advance such a goal: subsection (A) requires a request to happen at the earliest merits hearing; (B) permits relief only once; (C) requires the alien not to contest removability; and (D) ensures that no appeal will be taken. Subsection (E), by contrast, would be unauthorized by such a construction because it lacks such a nexus and would actually *increase* the administrative burden by requiring an IJ to conduct a full hearing for individuals like Mr. Pedrotti and bear the additional burden of potential appeal.

---

§ 1252(a)(2)(D), permitting judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals," appears to permit direct review of the argument raised by Mr. Pedrotti, notwithstanding "any other provision of this chapter . . . which limits or eliminates judicial review." Finally, precluding consideration of the regulation here would raise serious constitutional problems. Accord United States v. Klein, 80 U.S. (13 Wall.) 128, 146 (1871) (Congress lacks authority to enact statutes purporting to deny jurisdiction, but which effectively "prescribe a rule for the decision of a cause in a particular way").

## IV.

## CONCLUSION

The Immigration Judge erred when he concluded and failed to advise Mr. Pedrotti that he qualified for an adjustment of status to that of a permanent resident and for voluntary departure. This error deprived Mr. Pedrotti of his due process right to a fair removal proceeding. The indictment against him should be dismissed.

Respectfully submitted,

DATED: September 11, 2008

/s/ *Shaffy Moeel*

**SHAFFY MOEEL**
Federal Defenders of San Diego, Inc.
Attorneys for Eder Pedrotti-Juarez

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her information and belief, and that a copy of the foregoing document has been served this day upon:

**Anne Kristina Perry**
Anne.Perry2@usdoj.gov,Cindy.Muncy@usdoj.gov,efile.dkt.gc1@usdoj.gov

Dated: September 11, 2008

*/s/ Shaffy Moeel*
SHAFFY MOEEL
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101-5030
(619) 234-8467 (tel)
(619) 687-2666 (fax)
e-mail: Shaffy_Moeel@fd.org